IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

In Re:

**EMANUEL GONAZLEZ NIEVES**

Debtors

Case No. 18-07215 - BKT

Chapter 12

OBJECTION TO CONFIRMATION OF DEBTORS'
CHAPTER 12 PLAN DATED APRIL 17, 2019

TO THE HONORABLE UNITED STATES
BANKRUPTCY COURT:

By counsel, Banco Popular de Puerto Rico ("BPPR", "Banco Popular" or the "Bank"), respectfully represents and prays as follows:

### I. PROCEDURAL BACKGROUND

1. On December 11, 2018 Debtor filed his voluntary petition under Chapter 12 of the Bankruptcy Code. *See Docket 1*.

2. Banco Popular de Puerto Rico filed a secured claim in the amount of $882,948.15. The entire amount is due as Debtor has signed a consent judgment, which he has failed to comply with. *See Proof of Claim 7*.

3. Banco Popular has secured lien over 10,000 liters of Debtor's milk quota. Banco Popular also has a first mortgage lien in the amount of $30,000.00 over Debtor's Property Number 8979 located in Quebradillas; a first mortgage lien in the amount of $87,000.00 over Debtor's Property #10588 located in Quebradillas and a first and second lien in the amount of $207,600.00 and $76,000.00 over Debtor's property #3566 also located in Quebradillas. See Proof of Claim 7.

4. This is Debtor's third bankruptcy. Debtor's first Bankruptcy filed on July 16, 2010, was dismissed on July 9, 2013 because Debtor failed to make plan payments. See Case #10-06411-BKT.

5. Debtor filed his second bankruptcy On April 4, 2014, the case was again dismissed due to Debtor's default with the terms of the confirmed plan, on February 5, 2016. See Case #14-02767-BKT.

6. On April 17, 2019, Debtor filed its Chapter 12 Plan. *See Docket 38.*

7. Banco Popular objected to Debtor's Chapter 12 Plan for various reasons among them BPPR opposed the value given by Debtor to BPPR's collateral real properties and BPPR argued that Debtor lacks feasibility given the income generated by its operation. *See Docket 44.*

*8.* On July 1, 2019, Debtor filed an Amended Chapter 12 Plan. In this Amended Plan, Debtor now plans to lift the stay on two properties, Property 8,979 and Property 10,688 and only pay as secured $222,125.00 which is secured by the milk quota of 10,000 liters valued at $135,000.00 and the lot of land of 13.5 valued at $87,125.00. The Debtor will pay the $222,125.00 in a term of 11 years and 10 months. The First 60 months will be a monthly payment of $1,5000.00 with an interest rate of 4.75%, after the first 60 months Debtor will pay BPPR the monthly amount of $3,000.00 for 81 months and $1,858.88 for the last month. With an interest rate of 6.75%. *See Docket 62.*

9. Banco Popular de Puerto Rico, once more objects to this Chapter 12 Plan, for lack of feasibility, and for failure to comply with 11 U.S.C. § 1125(a) 4 and 5. Debtor does not have sufficient income to make the plan payments, and the payment plan proposed to BPPR is too long, thus passing all the risk to BPPR and once more objects to the value given the property used as secured collateral.

## II. LEGAL ANALYSIS

### A. The Chapter 12 Plan does not meet the legal standards for feasibility under 11 USC § 1225(a)(6).

1. 11 U.S.C. Section 1225(a)(6) requires the Plan to be feasible. The Plan can be confirmed only if "the Debtors will be able to make all payments under the plan and to comply with the plan." 11 USCS § 1225(a)(6). The Eighth Circuit's feasibility test considers whether provisions in a plan are achievable given the unique facts of the case. In re Bowman, 253 B.R. 233, 238-39 (B.A.P. 8th Cir. 2000). This Court will only approve a plan if it has a rational likelihood of success. In re Danny Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 963 (8th Cir. 2001). A plan projecting a marked increase in profitability with no explanation of the cause is not confirmable. In re Euerle Farms, Inc., 861 F.2d 1089, 1091 (8th Cir. 1988).

2. Feasibility "is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." In re Howard, 212 B.R. 864, 878 (Bankr. E.D. Tenn. 1997). When deciding feasibility, a Debtors' proposed plan payments must be analyzed using projected income and expenses in order to ascertain whether the Debtors have a likely ability to make all payments required under the plan. In re Elk Creek Salers, Ltd., 286 B.R. 387, 396 (Bankr. W.D. Mo. 2002). "Technical feasibility alone, however, is insufficient. The plan must also be realistic; the Debtors must be able to do what they are proposing." Howard, 212 B.R. at 880.

3. Debtors bear the burden of proof that a Chapter 12 plan is feasible. Nevertheless, "because the purpose of Chapter 12 is to promote the reorganization attempts of family farmers, courts generally give Debtors the benefit of the doubt on the issue of feasibility, provided a reasonable probability of success is established." In re Lockard, 234 B.R. 482 at 492 (Bankr. W.D. Mo. 1999). They are not required to guarantee "the ultimate success" of their plan, "but

3

only to provide a reasonable assurance that the plan can be effectuated, and that reasonable assurance must rise above 'bare agronomic feasibility.'" In re Wilson, 378 B.R. 862, 891 (Bankr. D. Mont. 2007) (quoting Miller v. Nauman, 213 B.R. 355, 358 (B.A.P. 9th Cir. 1997)). "Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." Lockard, 234 B.R. at 492 (quoting Clarkson v. Cooke Sales and Service Co. (In re Clarkson), 767 F.2d 417, 420 (8th Cir. 1985)); see also In re Michels, 301 B.R. 9, 17 (Bankr. N.D. Iowa 2003) ("A plan projecting a marked increase in profitability with no explanation of the cause is not confirmable."); Howard, 212 B.R. at 879 (holding that feasibility "must be based on objective facts rather than wishful thinking").

4. Given the above legal standard requiring the Debtor's to provide a showing of feasibility, Debtor has not met this burden as no projections were included in the Chapter 12 Plan. There is no reasonable probability of success.

5. A review of Debtor's monthly operating reports demonstrates that Debtor cannot make the payments outlined in the Chapter 12 Plan and will most likely never be able to make them given the way the milk industry currently operates them. According to Debtor's Chapter 12 Plan Summary of Payments, the Debtor needs to make monthly payments of **$2,800.00.**

6. Analyzing Debtor's net income from the past months, shows that Debtor cannot make the $2,800.00 monthly payment. While Debtor has had a positive income and has improved his production and increased his net income, he does not generate enough to be able to pay the Chapter 12 Plan and have a profitable operation.

4

| MONTH | INCOME (from milk production) | EXPENSES (Including payment to BPPR) | NET INCOME | Shortfall |
|---|---|---|---|---|
| December | $5,148.22 | $5,095.20 | $53.02 | **($1,746.98)** |
| January | $12,768.47 | $12,384.00 | $384.47 | **($1,415.53)** |
| February | $8,494.68 | $7,987.20 | $507.48 | **($1,292.52)** |
| March | $11,003.17 | $10,042.20 | $960.97 | **($839.03)** |
| April | $7.735.56 | $6,139.34 | $1,596.22 | **($203.78)** |
| May* | $10,518.90 | $11,724.23 | ($1,205.33) | **($3,005.23)** |
| June | $8,259.96 | $5,945.27 | $2,314.69 | $514.69 |
| * In May Debtor received a FSA incentive of $20,525.48 of which $16,250 was used to purchase cows and the rest was used for other expenses and/or remained as net income of $3,070.13. | | | | |

7. In January Debtor's income and expenses were higher because family members lent or gave him $7,000.00 which he used to purchase 6 cows. In March his income and expenses were higher because he received incentives which allowed him to buy two cows and used to pay off the outstanding amounts, he owned on his alimony payments. Once again in May his income was higher because Debtor received an incentive in which he bought 10 cows and had a remaining amount left of $4,275.48, which he used for other expenses in the farm including to purchase machinery for cutting hay.

8. Regardless, eliminating May given that the month was not a normal month given the incentive received by Debtor, Debtor is only able to make the Chapter 12 Plans in June, in all the other months, Debtor is unable to make the payments.

9. In June, Debtor for the first time reports sufficient income without receiving any incentives to be able to pay the Chapter 12 Plan. However, in spite of having purchased 10 cows the amount of concentrated feed Debtor is purchasing seems to be more or less the same amount. In addition, during the month of June no ASUME expenses were reported.

10. Debtor is currently producing at approximately 50-60% of his quota, his last production result in June was almost 60%. However, of this 60%, only 45% was paid at $0.75 while the remaining was 15% was paid at $0.33 cents. During the first two weeks of June only 40% of his production was paid at $0.77 cents and the remaining 27% was paid at $0.45. The Debtor is currently being paid at levels one and two but if he continues to increase his production the payment can drop to level 3 and/or not be paid. In the month of June an average of 21% was being paid at an average of $0.39. For that same month it cost Debtor approximately $0.47 per each liter produced. Which means every time Debtor is paid less than the first level, Debtor is losing money. As BPPR stated in the objection for Debtor's first Chapter 12 Plan, Debtor has reached peak production, now that we see that Debtor has surpassed peak production, Debtor is not only demonstrating diminishing returns, but the numbers show that Debtor is actually losing money when he produces more than level 1 production levels.

11. In June, the only month Debtor would have been able to fulfill the Chapter 12 month, based on his production. Debtor had a net income of $2,314.69 minus the $1,800.00 needed to fulfill the Chapter 12 Plan, Debtor would have $514.69 if we subtract the $250 ASUME requirement then it would be $264.69 remaining. Both numbers the $514.69 and the $264.69 are too small to show feasibility. Moreover, there is no explanation as to why Debtor has purchased the same amount of concentrated food having 10 more cows. If it was a mere replacement of cows, it means that eventually once these cows have passed their peak milk production levels, Debtor's production will once more again to decrease. So in 9-10 months Debtor's production will decrease once again.

12. The lack of projections does not allow Creditors to see how the Debtor estimates it can increase his income to have a feasible Chapter 12 Plan.

13. Debtor also fails to explain how the reduction in real property space will affect the cow production. In the new Chapter 12 Plan, Debtor will now reduce his operations to one field of 13.53 cuerdas and allow the bank to foreclose on a second property of 12 acers and a third of 900 square meters. According to the Natural Resources Conservation Services[1] of the United States Department of Agriculture the rule of thumb is that it takes 1.5-2 acres to feed a grazing cow, given that in Puerto Rico cows are also fed a lot of concentrated food, dairy farmers in Puerto Rico do not follow this rule. However, reducing the land for the cattle by almost half can only have a negative effect on the cows and/or Debtor's operation.

14. Given that Debtor is not producing enough to meet his obligations under the Chapter 12 Plan, and that it will be extremely difficult and improbable for Debtor to be able to generate the necessary income, this Honorable Court **SHOULD NOT** confirm the Chapter 12 Plan. Moreover, Debtor's two prior bankruptcy failures show us that if this Court approves this Chapter 12 Plan, history will most likely repeat itself and the case will be dismissed due to failure to make plan payments.

### B. The Chapter 12 plan fails to comply with Section 1125(a) 4 and 5.

15. Under Section 1125(a)(5) a creditor must be paid an amount equal to the fair market value of the collateral. This amount can be paid overtime, often for as long a period as would be appropriate for a new loan of that type. The creditor is entitled to receive interest payments at market rate.

16. Debtor's Chapter 12 Plan is not paying BPPR an amount equal to the fair market value in a reasonable time frame.

17. BPPR objects to the value proposed by Debtor to the real property that it will retain. The Property of 13.53 cuerdas, which Debtor's appraiser valued at $34,750.00, BPPR's appraiser

---

[1] https://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb1167344.pdf

7

valued it at $140,000.00. Debtor is now splitting the difference and setting the value at $87,125.00, however BPPR objects to the value of $34,750.00 as being too low. It is highly unlikely that in less than a year it has devalued by more than $100,000.00.

18. Given Debtor's inability to be able to make payments for the full value of the secured claim, BPPR and would receive more under a liquidation plan than under the plan presented by Debtor, therefore the Plan fails to meet Section 1225(a)(4) of the Bankruptcy Code.

19. The term provided by Debtor is also too long, considering that BPPR currently has a consent judgment on the property. To expect BPPR to wait an additional 10 years is excessive. All four of the loans underlying the debt are due, the first (the loan ending in 9018) was due on August 2004, the second (loan ending in 9019) was due on May 2018, the third (loan ending in 9020) was due July 2008 and the (fourth loan ending in 9021) was due on April 2009.

20. By extending the repayment by ten years, even though Debtor is providing interest, BPPR would be better off under a liquidation scenario now. Especially, if Debtor is claiming that the property has devalued so much, a long-term payment scenario will not protect BPPR from a further decrease in value. BPPR has already been negatively affected by Debtor's two prior bankruptcies, every time Debtor files for bankruptcy Debtor is in a worse position and as a result BPPR's collateral has decreased in value. The continual postponement of the selling of Debtor's assets results in BPPR receiving less than it would if Debtor liquidates under a Chapter 7 scenario or under a Chapter 12 liquidation plan. As stated in BPPR's last objection, BPPR would be better off under a liquidation scenario.

### C. Debtor has not filed this Chapter 12 Plan in good faith.

21. If a Plan has not been proposed in good faith, it cannot be confirmed according to Section 1225(a)(3). *See,* In re Braxton*, 124 B.R. 870*, 875 (Bankr. N.D.Fla. 1991).

22. This Plan was not proposed in good faith. Debtor knows it cannot make the payments outlined under the Chapter 12 Plan. Debtor knows it is undervaluing the real property in order to pay BPPR less than what BPPR would receive in a liquidation analysis. This is Debtor's third bankruptcy, he was unable to make the payments under two prior confirmed bankruptcy plans and is now asking the Court to approve a third plan, in which he clearly will not be able to comply. Debtor must provide a liquidation plan the plan presented is clearly not a plan filed good faith.

WHEREFORE, BPPR requests this Honorable Court to note of the above stated objections and to DENY confirmation of Debtors' Chapter 12 Plan.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, on July 30, 2019.

CERTIFICATE OF SERVICE: I hereby certify that on this same date I have filed a true and exact copy of the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification to the CM/ECF participants.

**DAGMAR FERNANDEZ, ESQ.**
Legal counsel for Banco Popular de Puerto Rico
P.O. Box 8526
San Juan, Puerto Rico 00910-8526
Phone: 787/444-7703
Fax: 787/289-0567
Email: df-law@outlook.com

*s/Dagmar I. Fernandez*
By:_____
Dagmar I. Fernandez, Esq.
USDC No. 223707